# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, and STATE OF WASHINGTON,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR and U.S. FISH AND WILDLIFE SERVICE,<br><br>*Defendants.* | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Civil Action No. 1:21-cv-452 |

## INTRODUCTION

1.      The plaintiff States of New York, California, Connecticut, Illinois, Maryland, Minnesota, New Jersey, New Mexico, Oregon, and Washington, and the Commonwealths of Massachusetts and Pennsylvania (collectively, the "States") bring this action against defendants U.S. Department of the Interior ("Interior") and U.S. Fish and Wildlife Service ("FWS").  The States seek a declaration that FWS's final rule titled "Regulations Governing Take of Migratory Birds," 86 Fed. Reg. 1134 (Jan. 7, 2021) (the "Final Rule") is unlawful and ask the Court to vacate it.

2.      The Migratory Bird Treaty Act ("MBTA" or the "Act") prohibits taking or killing migratory birds "at any time, by any means or in any manner," unless otherwise permitted by regulation.  16 U.S.C. § 703(a).  For nearly 40 years, from the 1970s until 2017, Interior and FWS interpreted the Act to prohibit killing or taking migratory birds whether doing so was the purpose of one's actions or incidental to one's actions.  That interpretation was consistent with the Act's unambiguous text, protective purpose, and legislative history, as well as Second Circuit precedent and principles of international comity.  The threat of prosecution incentivized industry to mitigate foreseeable hazards such as oil spills, poison, and electrocution, which saved the lives of millions of migratory birds.

3.      In December 2017, Interior issued an "M-Opinion," known as M-37050 or the Jorjani Opinion, that unlawfully reinterpreted the Act to apply only to conduct "directed at" birds.  On August 11, 2020, this Court held that the Act's

"clear language making it unlawful 'at any time, by any means or in any manner, to . . . kill . . . any migratory bird' . . . is in direct conflict with the Jorjani Opinion." *NRDC v. U.S. Dep't of the Interior*, Nos. 18-CV-4596 (VEC), 18-CV-4601 (VEC), 18-CV-8084 (VEC), 2020 WL 4605235, at *9 (S.D.N.Y. Aug. 11, 2020), *appeal pending*, No. 20-3491 (2d Cir. Oct. 9, 2020).  The Court ruled that the Jorjani Opinion was contrary to law and vacated it.  *Id.* at *14.

4.      On January 7, 2021, FWS published a rule (the Final Rule) that "adopts the conclusion of [the Jorjani Opinion]" and thereby "defines the scope of the MBTA's prohibitions to reach only actions directed at migratory birds."  86 Fed. Reg. at 1134.  It is scheduled to take effect on February 8, 2021.

5.      The Final Rule is arbitrary, capricious, and otherwise contrary to law. Like the Jorjani Opinion, the Final Rule is based on the premise that the Act does not prohibit incidental take, and it is thus in "direct conflict" with the Act's "clear language" and "runs counter to the purpose of the MBTA to protect migratory bird populations."  *See NRDC*, 2020 WL 4605235, at *8-9.  In addition, the Final Rule is inconsistent with subsequent legislation reaffirming Congress's understanding that the Act prohibits incidental take, Second Circuit precedent, and international treaty obligations.

6.      The Final Rule harms the States by depriving them of the MBTA's protections of migratory birds that engage in breeding, feeding, and sheltering activities as those birds migrate within and through the States' territories.  The States own and/or hold these species in trust for their citizenry and benefit from

2

both the specific ecological services the birds provide—including controlling insects and rodents, pollinating, and dispersing seeds—and the role the birds play in maintaining ecological balance generally, including as prey for other animals.  The birds also provide scientific, recreational, and birdwatching opportunities and aesthetic benefits enjoyed by many people, including the States' residents.  All of these benefits, which directly or indirectly generate economic activity and tax revenue for the States, are lost or diminished when bird numbers are depleted by activities or conditions that unintentionally or incidentally take or kill migratory birds.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). The Final Rule is subject to judicial review under the Administrative Procedure Act because it constitutes final agency action for which there is no other adequate remedy.  5 U.S.C. §§ 702, 704.  The relief sought is authorized by 28 U.S.C. §§ 2201(a) and 2202 and 5 U.S.C. § 706.

8.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e)(1)(C) because this is a civil action brought against agencies of the United States and officers of the United States acting in their official capacities, and plaintiff State of New York resides within the district.

## PARTIES

### A.    Plaintiffs

9.    Plaintiff State of New York is a sovereign state of the United States of America.  As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of New York.  New York owns all wildlife in the State.  N.Y. Envtl. Conserv. Law § 11-0105.  This wildlife includes well over 300 species of migratory birds protected under the Act that nest in or regularly migrate through New York, the overwhelming majority of which migrate outside the State at some point during their lifecycles, and therefore leave New York's jurisdiction and ability to protect them through its own state laws and regulations.  New York has a long and established interest in the study and conservation of birds.  It is home to the National Audubon Society, the Cornell Lab of Ornithology, one of the world's preeminent academic centers for the study of birds, the American Museum of Natural History, and such world-renowned birding destinations as Central Park and Jamaica Bay National Wildlife Refuge.  In 1997, the New York State legislature enacted the New York state bird conservation area program to designate state-owned lands and waters of particular value as "important bird areas."  N.Y. Envtl. Conserv. Law § 11-2001.

10.    Plaintiff State of California is a sovereign state of the United States of America.  California Attorney General Xavier Becerra is the chief law officer of California, Cal. Const., art. V, § 13, and is authorized to seek judicial remedies to protect the natural resources of the State of California from pollution, impairment,

or destruction.  Cal. Gov. Code §§ 12600-12612; *see also Pierce v. Super. Ct.*, 1 Cal.2d 759, 761-62 (1934) (Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").  California is a major part of the Pacific Flyway, a migratory superhighway that runs from Alaska to South America. Millions of migratory birds consisting of hundreds of different species including threatened and endangered species move through California each year.  Migratory birds are vital to California's ecosystem, culture, and economy.  The 2011 National Survey of Fishing, Hunting, and Wildlife Associated Recreation stated that every year, 23% of Californians actively participate in wildlife-associated recreation including more than 6.4 million citizens engaged in wildlife-watching—including viewing migratory birds.  In addition to tens of millions of dollars that migratory-bird watching generates annually for California's tourism industry, California sells tens of thousands of licenses to hunt migratory waterfowl, directly generating millions of dollars in annual revenue for the State.  California brings this action on its own behalf to defend California's rights, obligations, and authority as a sovereign state to protect and defend its interests in maintaining the health and welfare of the natural resources within its jurisdiction, including wildlife and protected species, and for the benefit of its citizens' health, welfare, and aesthetic, scientific, and recreational opportunities.

11.    Plaintiff State of Connecticut brings this action by and through Attorney General William Tong.  The Attorney General of Connecticut is generally

authorized to have supervision over all legal matters in which the State of
Connecticut is a party.  He is also statutorily authorized to appear for the State "in
all suits and other civil proceedings, except upon criminal recognizances and bail
bonds, in which the State is a party or is interested . . . in any court or other
tribunal, as the duties of his office require; and all such suits shall be conducted by
him or under his direction."  Conn. Gen. Stat. § 3-125.  Pursuant to the Connecticut
Endangered Species Act, Conn. Gen. Stat. § 26-303 et seq., it is the position of the
Connecticut General Assembly that those species of wildlife and plants that are
endangered or threatened are of "ecological, scientific, educational, historical,
economic, recreational and aesthetic value to the people of the [State of
Connecticut], and that the conservation, protection, and enhancement of such
species and their habitats are of state-wide concern."  *Id*. § 26-303.  As a
consequence, "the General Assembly [of Connecticut] declares it is a policy of the
[S]tate to conserve, protect, restore, and enhance any endangered or threatened
species and essential habitat."  At least twenty federally and/or state-listed
endangered or threatened bird species are known to occur in Connecticut, including,
but not limited to, the American bittern (*Botaurus lentiginosus*), the barn owl (*Tyto
alba*), the roseate tern (*Sterna dougallii*), the peregrine falcon (*Falco peregrinus*)
and, most famously, the bald eagle (*Haliaeetus leucocephalus*).  All of these, and
hundreds of other species found in Connecticut, are protected under the MBTA.
Connecticut also has enacted and devotes significant resources to implementing a
comprehensive environmental statutory scheme concerning the conservation,

protection, restoration and enhancement of the avian wildlife resources and habitats within the State, including the Connecticut Endangered Species Act, which protects hundreds of imperiled species and their habitats, as well as the Connecticut Environmental Protection Act, which protects the air, water, and natural resources of the State held within the public trust. *See* Conn. Gen. Stat. §§ 26-303 et seq.; 22a-14 et seq. As such, the State of Connecticut has a sovereign and statutorily mandated interest in protecting species in the State from harm both within and outside of the State.

12.    Plaintiff State of Illinois brings this action by and through Attorney General Kwame Raoul. The Attorney General is the chief legal officer of the State of Illinois, Ill. Const., art. V, § 15, and "has the prerogative of conducting legal affairs for the State," *EPA v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977). He has common law authority to represent the People of the State of Illinois and "an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992). Illinois, bordered on the west by the Mississippi River, lies on the Mississippi Flyway through which millions of birds migrate north and south annually. The Illinois Wildlife Code protects the hundreds of migratory bird species that nest or winter in, or migrate through, the State. 520 ILCS 5/2.2 (2016). Under this law, Illinois has "ownership of and title to all wild birds . . . within the jurisdiction of the State." *Id.* at 2.1.

13.     Plaintiff State of Maryland, a sovereign entity, brings this action by and through its Attorney General, Brian E. Frosh, on behalf of itself and on behalf of its citizens and residents. The Attorney General of Maryland is the State's chief legal officer with general charge, supervision, and direction of the State's legal business. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents with respect to, among other things, protecting the natural resources and environment of the State. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1, § 7. FWS's interpretation of the MBTA poses just such a threat. The State of Maryland holds in trust all game and wildlife within its borders, including migratory birds. Of the over 300 species of birds regularly found in Maryland, all but seven are included in the MBTA's 2013 list of protected species. All 141 of the species that Maryland has designated as Species of Greatest Conservation Need are listed under the MBTA. A federal government study estimated that wildlife watching, including watching, photographing, and feeding birds, generated over $480 million in Maryland in 2011. The same study showed that an estimated 27% of Maryland residents are wildlife watchers, and over 900,000 residents and non-residents enjoy birding in the state. In addition, birds in Maryland play critical roles in pest control and protection of human health; declines in bird populations often indicate environmental issues that affect human health. Maryland brings this action to protect the public interest in the natural resources

within its jurisdiction, including its bird species, and for the benefit of its citizens' health, welfare, and aesthetic, scientific, and recreational opportunities.

14.     Plaintiff Commonwealth of Massachusetts, as a body politic and a sovereign state of the United States of America, brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of Massachusetts.  Massachusetts is the sovereign and proprietary owner of all wildlife within the Commonwealth, which it holds in public trust for the benefit of all of its people.  *Dapson v. Daly*, 257 Mass. 195, 196, 153 N.E. 454, 454 (1926).  As early as 1818, the Commonwealth recognized the public health, environmental, and economic benefits that certain migratory birds provided to the Commonwealth and its citizens and became one of the first states in the country to protect them while they remained in the Commonwealth's territory.  An Act to Prevent the Destruction of Certain Useful Birds at Unseasonable Times of the Year, 1817 Mass. Acts 504-05. This wildlife includes well over 400 species of migratory birds protected under the Act that have been recorded in the Commonwealth, the overwhelming majority of which migrate outside the Commonwealth at some point during their lifecycles and therefore lie outside the Commonwealth's ability to fully protect.  Massachusetts is home to world-class birding destinations, including Cape Cod and the Great Meadows National Wildlife Refuge.  Manomet, Inc., a science-based non-profit organization headquartered in Massachusetts, is a leader in research and conservation of certain migratory bird species.  The Commonwealth has relied on the Defendants' prior, longstanding interpretation of the Act to deter activities

within and outside of Massachusetts that result in incidental taking or killing of migratory birds.

15.    Plaintiff State of Minnesota is a sovereign state of the United States of America.  It brings this action by and through its Attorney General, Keith Ellison, on behalf of itself and on behalf of its citizens and residents.  The Attorney General of Minnesota is a constitutional officer, Minn. Const. art. V, tasked with representing and vindicating the interests of the state, its agencies, and its people in *parens patriae* capacity, Minn. Stat. § 8.01 et seq.; *Humphrey v. Std. Oil Co.*, 568 F. Supp. 556, 563 (D. Minn. 1983).  The Minnesota Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota, its natural resources, and its residents.  *Id.*  The State of Minnesota owns wildlife in the state, including migratory birds.  Minn. Stat. §97A.501, subd. 1.  Minnesota has enacted and devotes significant resources to implementing numerous laws concerning the management, conservation, protection, restoration, and enhancement of its wildlife resources, including migratory birds and other avifauna. *See, e.g.*, Minn. Stat. Ch. 97A.  FWS's reinterpretation of the MBTA's takings clause poses a threat to Minnesota, its residents, and its wildlife.  Minnesota is situated along the Mississippi Flyway, a major corridor for migratory birds.  Among Minnesota's most treasured resources for biodiversity and recreation along this flyway are the St. Croix National Scenic Riverway, Boundary Waters Canoe Area Wilderness, Voyageurs National Park, and a number of state parks that contain essential

habitat for migratory birds.  Minnesota, the Land of 10,000 Lakes, contains unique boreal forest, freshwater lakes, rivers, and other wetlands, and Lake Superior coastal areas that have been deemed essential habitat for one or more breeding, wintering, and/or migrating bird species.  Migratory birds do not just pass through the state; Minnesota's unique boreal forests are breeding grounds for various migratory species including warblers, vireos, and thrushes.  Birding is a popular recreational activity in Minnesota and is a core component of a robust tourism industry.  Several of birds listed for protection under the MBTA are currently endangered, threatened, or of special concern in Minnesota, including the piping plover, rufa red knot, king rail, and common tern.  These birds promote the well being and vitality of other species, human health, the environment, and the economy of Minnesota.  Migratory birds provide the same benefits outside the borders of Minnesota—their range extends beyond the United States, from the arctic to South America. The State of Minnesota brings this action to promote the interests of the state and its people in biodiversity, the economy, and aesthetic, scientific, and recreational opportunities.

16.     Plaintiff State of New Jersey is a sovereign state of the United States of America and brings this action on behalf of itself and as trustee, guardian and representative of the residents and citizens of New Jersey.  New Jersey holds wildlife in trust for the benefit of all its people.  The New Jersey Legislature has declared that it is the policy of the State to manage all forms of wildlife to insure their continued participation in the ecosystem.  N.J. Stat. Ann. § 23:2A-2.  Among

its diverse assemblage of wildlife, New Jersey counts over 300 species of migratory birds that nest or winter in, or migrate through, the State.  Over 40 of these species are waterfowl subject to legal hunting, while 30 currently hold a state "endangered" or "threatened" status.  New Jersey is home to the Cape May Bird Observatory, managed by the New Jersey Audubon Society, and the 47,000-acre Edwin B. Forsythe National Wildlife Refuge, which serves as nesting habitat for coastal songbirds such as salt marsh and seaside sparrows, and feeding grounds for many species of ducks, geese, herons and egrets.  New Jersey maintains key habitats relied upon by migratory birds along the Atlantic flyway and is heavily invested in managing such habitats, including vital foraging and nesting habitats along the coastal Barrier Islands and the Cape May Peninsula.  As an example, New Jersey invests considerable time, resources and funding to manage the red knot.  Twice annually, red knots migrate between South America and the Arctic, making a critically important stop in New Jersey and Delaware during the northern migration to feed on horseshoe crab eggs where the red knots must eat enough to continue their arduous journey to the Arctic.  New Jersey depends on its federal partners and other states to equally protect the red knot when it is not in New Jersey.  To fail to do so would result in New Jersey's efforts being squandered and wasted.  Migratory bird protection also has a significant impact upon New Jersey's economy.  In 2011, over 1.2 million New Jerseyans participated in bird watching activities generating $968 million in economic activity, and over 13,000 waterfowl

hunters generated economic activity equating to over $10 million to New Jersey's economy.

17.     Plaintiff State of New Mexico brings this action by and through Attorney General Hector Balderas.  The Attorney General of New Mexico is authorized to prosecute in any court or tribunal all actions and proceedings, civil or criminal, when, in his judgment, the interest of the state requires such action. NMSA 1978, § 8-5-2.  Under the Constitution of New Mexico, "protection of the state's beautiful and healthful environment is . . . declared to be of fundamental importance to the public interest, health, safety and the general welfare.  N.M. Const. art. XX, § 21.  This provision "recognizes that a public trust duty exists for the protection of New Mexico's natural resources . . . for the benefit of the people of this state." *Sanders-Reed ex rel. Sanders-Reed v. Martinez*, 350 P.3d 1221, 1225 (N.M. Ct. App. 2015).  Tourism, often centered on outdoor recreational activities, is an important driver of New Mexico's economy.  In 2015, tourism accounted for $6.1 billion in direct spending and created roughly 89,000 jobs.  Migratory birds are important to New Mexico's tourism industry.  New Mexico ranks fifth nationally for the portion of bird watchers coming from out of state (46%).  The Bosque del Apache National Wildlife Refuge alone brings in $13.7 million annually from non-residents along with $4.3 million in regional tax revenue.  Established in 1939 to provide a critical stopover for migrating waterfowl, the Bosque del Apache NWR is recognized as one of the premier bird-watching areas in North America, famous for the spectacle of tens of thousands of wintering Sandhill Cranes and Snow Geese, and

home to over 340 species of birds. The Refuge is within the Rio Grande Corridor, an important migratory, wintering and nesting corridor for migratory birds within the arid intermountain west that follows the Rio Grande the length of the State from Colorado in the north to Texas in the south. It supports over 200,000 waterfowl, 18,000 greater sandhill cranes and tens of thousands of other water and shorebirds.

18.    Plaintiff State of Oregon brings this suit by and through Oregon Attorney General Ellen Rosenblum. The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the interests of the state. Ore. Rev. Stat. § 180.060(1). The Oregon Department of Fish and Wildlife, established as a state agency by the Oregon Legislature pursuant to Ore. Rev. Stat. § 496.0780, has requested that the Attorney General bring this suit to protect Oregon's sovereign and proprietary interest in maintaining healthy populations of migratory birds. The Attorney General also brings this suit as parens patriae on behalf of the state's affected citizens and residents. Under Oregon law, "Wildlife is the property of the state." Ore. Rev. Stat. § 498.002. As Oregon is a Pacific coast state and part of the Pacific Flyway, migratory birds are a vital part of Oregon's landscape, history, and economy. The 2011 National Survey of Fishing, Hunting, and Wildlife Associated Recreation stated that 46% of Oregonians actively participate in wildlife-associated recreation including more than 1.2 million citizens engaged in wildlife-watching—

including viewing migratory-birds—every year.  Oregon has relied on the federal government's previous longstanding interpretation of the MBTA to protect migratory birds from killing or taking by any means and in any manner, including so-called 'incidental' (non-deliberate) killing or taking.  Indeed, the Oregon Department of Fish and Wildlife's ("ODFW") administrative rules specifically state that ODFW "recognizes the authority and role of the federal government as provided by the Migratory Bird Treaty Act of 1918."  Or. Admin. R. 635-130-0020).  Oregon has relied on the federal government to protect migratory birds both while they are in Oregon and while they are in other States, as the overwhelming majority of migratory birds that spend time in Oregon also spend time in other States, where Oregon has no power to protect them.  Under the previous, longstanding federal interpretation of the MBTA, when advising other state agencies, individuals and corporate entities about their responsibility to avoid, minimize, and mitigate for the impacts of their activities on wildlife and habitats, ODFW referred applicants to the FWS for regulatory guidance and best practices relating to migratory birds.  The new interpretation of the MBTA jeopardizes the populations of migratory birds that make up a critical base for the wildlife-associated economy that currently thrives in Oregon.  By harming migratory birds, the Final Rule threatens to diminish the quality of birdwatching in Oregon and to reduce State tax revenues generated by that activity.

19.    Plaintiff Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by

Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.  Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority.  71 Pa. Stat. § 732-204.  The Commonwealth of Pennsylvania has a sovereign interest in its public natural resources, which "are the common property of all the people, including generations yet to come."  Pa. Const. art. I, § 27.  The Commonwealth, as trustee, must "conserve and maintain them for the benefit of all the people."  *Id.*; *Robinson Twp., Washington Cty. v. Pennsylvania*, 83 A.3d 901, 955-56 (Pa. 2013); *see also* 34 Pa. Stat. and Cons. Stat. §§ 34, 2161.  The Pennsylvania Constitution further protects every Pennsylvania resident's "right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment." Pa. Const. art. I, § 27.  As such, the Commonwealth of Pennsylvania has an interest in protecting species in the Commonwealth from harm both within and outside of the Commonwealth.  Pennsylvania lies within the Atlantic flyway, and millions of birds move through the Commonwealth each year.  Pennsylvania is home to a rich variety of habitats, including 80 Important Bird and Biodiversity Areas encompassing nearly 1.5 million acres, which serve as important migratory staging areas, winter roost sites, and prime breeding grounds.  Pennsylvania contains some of the most iconic migratory birding spots in the country—including Hawk Mountain, one of the best-known hawk-watching sites in the world—that attract birders from all around the country.

20.     Plaintiff State of Washington is a sovereign entity.  The Attorney General is the chief legal advisor to the State of Washington, and his powers and duties include acting in federal court on matters of public concern.  This challenge is brought pursuant to the Attorney General's statutory and common law authority to bring suit and obtain relief on behalf of Washington.  Washington brings this action to protect its sovereign and proprietary rights over its natural resources, including thousands of migratory birds.  Wash. Rev. Code § 77.04.012; *see also* Wash. Rev. Code §§ 77.110.030, 90.58.020.  Washington is a member of the Pacific Flyway Council, an administrative body consisting of public wildlife agencies that, among other things, sets migratory bird policy and regulations and contributes to migratory bird research for the major migratory route that extends from Alaska to South America.  In 2011, bird and other wildlife watchers expended $3.2 billion in Washington and generated an economic impact of about $5.5 billion, with migratory bird watching being an essential component of that economic impact.

21.     The States and their citizens, on whose behalf the States hold all wildlife, including migratory birds, in trust, rely on and benefit from the Act's application to incidental take or killing of migratory birds and thus, as described in greater detail below, are injured by the Final Rule's unlawful reversal of the Defendants' prior, longstanding interpretation and application of the Act.  This injury would be remedied by an order vacating the Final Rule.

**B.        Defendants**

22.      Defendant Interior is an agency of the U.S. government and is responsible for administering and enforcing the Act.

23.      Defendant FWS is also an agency of the U.S. government and is the bureau within Interior responsible for administering and enforcing the Act.

## FACTS

**A.      The Migratory Bird Treaties**

24.      In 1916, the United States signed a treaty with Great Britain, acting on behalf of Canada, to protect migratory birds (the "Canada Treaty").  To implement that treaty, Congress enacted the MBTA in 1918.  *See* 16 U.S.C. §§ 703-712.  The Canada Treaty proclaimed an expansive goal of "insuring the preservation of such migratory birds as are either useful to man or are harmless."  *See* Preamble, 39 Stat. 1702 (Aug. 16, 1916).

25.      The United States later signed similar treaties with Mexico, Japan, and the Soviet Union.  *See* 16 U.S.C. § 703(a).  The treaties with Japan and the Soviet Union, as well as the amended treaty with Canada, address unintentional harm caused by pollution.  The MBTA was amended to incorporate these treaties.

**B.      The Migratory Bird Treaty Act**

26.      The MBTA provides that "it shall be unlawful at any time, by any means or in any manner" to, among other things, "pursue, hunt, take, capture, kill, attempt to take, capture, or kill" migratory birds unless authorized by regulation.

*Id.* The general prohibition does not include a mental state requirement. *Id.*
Unless specified, violations are misdemeanors. *Id.* § 707(a).

27.    Congress subsequently added mental state requirements to two
specific provisions of the Act but did not add them to the general prohibition. In
1986, Congress amended the Act to specify that the provision making the sale of
migratory birds a felony would apply only to actions taken knowingly. *See* 16
U.S.C. §§ 707(b)-(c). The accompanying Senate Report explained that "[n]othing in
this amendment is intended to alter the 'strict liability' standard for misdemeanor
prosecutions . . .[,] a standard which has been upheld in many Federal court
decisions." S. Rep. No. 99-445, at 16 (1986).

28.    In 1998, Congress added a negligence requirement to the Act's
prohibition on hunting over a baited field, requiring proof that "the person knows or
reasonably should know that the area is baited." 16 U.S.C. § 704(b)(1). In doing so,
the Senate stressed that the negligence requirement applied only in the narrow
context of the baiting provision:

> The elimination of strict liability, however, applies only to hunting with
> bait or over baited areas, and is not intended in any way to reflect upon
> the general application of strict liability under the MBTA. Since the
> MBTA was enacted in 1918, offenses under the statute have been strict
> liability crimes. The only deviation from this standard was in 1986,
> when Congress required scienter for felonies under the Act.

S. Rep. No. 105-366, at 3 (1998).

29.    In 2002, Congress enacted legislation temporarily authorizing
"military readiness activities" that incidentally take or kill migratory birds and
directing Interior to exercise its authority to promulgate regulations governing

incidental take after the period of temporary authorization expired. *See* Pub. L. No. 107-314, § 315, 16 Stat. 2458, 2509 (2002). This legislation reaffirmed that activities that incidentally take or kill migratory birds are prohibited unless explicitly authorized.

### C.    Enforcement of the MBTA Before December 2017

30.    From the 1970s until Interior issued the Jorjani Opinion in December 2017, Interior interpreted the MBTA to prohibit incidental take, *i.e.*, activities that result in bird deaths but are not done with the purpose of killing birds.

31.    Based on that interpretation, FWS investigated incidental takes caused by oil pits, oil spills, power lines, waste pools, and pesticides, among other hazards, including, for example, the deaths of 92 migratory birds in "toxic and noxious waters" near an industrial plant in New York. *See United States v. FMC Corp.*, 572 F.2d 902, 903-05 (2d Cir. 1978).

32.    FWS generally pursued criminal prosecution only after working with industry to find solutions and educating industry about ways to avoid or minimize incidental take.

33.    The standard enforcement procedure was to "provide notice to industry of the risks posed by facilities and equipment, encourage compliance through remediation, adaptive management and, where possible, permitting, and reserve for prosecution those cases in which companies ignore, deny, or refuse to comply with a [Best Management Practices] approach to avian protection in conducting their business." Jorjani Opinion at 38 n.205.

34.    FWS enforcement officers relied on the MBTA to prevent industrial and agricultural activities from killing vast numbers of migratory birds.  FWS followed enforcement protocols to discourage industrial activities that predictably but unnecessarily killed birds, emphasizing cooperation and voluntary mitigation measures, and taking enforcement actions primarily against those actors who refused to implement protective measures.

35.    When approached by FWS, the vast majority of industry actors complied with requests to mitigate hazards to birds, which obviated the need for enforcement and prevented incidental take.

## D.    Interior's Consistent Interpretation of the MBTA Before December 2017 to Prohibit Incidental Killing or Take

36.    In 2001, Interior's longstanding interpretation of the MBTA was reaffirmed by an executive order clarifying that "take," for purposes of MBTA regulations, "includes both 'intentional' and 'unintentional' take."  Exec. Order No. 13186, 66 Fed. Reg. 3853 § 2(a) (Jan. 10, 2001).  The order cited the "substantive obligations on the United States for the conservation of migratory birds and their habitats" imposed by treaties and stated that "migratory birds are of great ecological and economic value to this country" and "bring tremendous enjoyment to millions of Americans."  *Id.* § 1.

37.    In 2008, the United States and Canada discussed Canadian legislation to make "the authorization of incidental take contingent on compliance with approved conservation measures."  Note No. 0005 from Canadian Embassy to United States Department of State, at 3 (July 2, 2008).  Canada explained that the

parties "specifically reviewed the issues of the incidental take of migratory birds, nests or eggs, caused by activities including, but not limited to, forestry, agriculture, mining, oil and gas exploration, construction and fishing activities, and concluded that these issues have become a concern for the long-term conservation of migratory bird populations." *Id.* at 2-3. The parties agreed in diplomatic notes that the legislation would be consistent with their "mutually held interpretation" of the treaty. *Id.* at 3.

38.     In January 2017, Interior's Solicitor, Hillary Tompkins, issued an M-Opinion officially known as M-37041 (the "Tompkins Opinion") that reaffirmed FWS's "long-standing interpretation that the MBTA prohibits incidental take." Tompkins Opinion at 2. This interpretation was based, *inter alia*, on FWS's understanding that "the MBTA's prohibition of take 'by any means and in any manner' unambiguously includes incidental take." *Id.* at 2 n.5.

## E.     Reinterpretation of the MBTA by the Interior Department in the Jorjani Opinion

39.     In December 2017, Interior's then Deputy Solicitor, Daniel Jorjani, issued an M-Opinion finding that the MBTA applied only to "affirmative actions that have as their purpose the taking or killing of migratory birds, their nests or their eggs." Jorjani Opinion at 2.

40.     To implement its reinterpretation, in April 2018, FWS issued guidance explaining that FWS "will not withhold a permit, request, or require mitigation based upon incidental take concerns under the MBTA." This formally directed

agency enforcement staff not to utilize potential MBTA liability to prevent or reduce incidental take. FWS cut staff that previously engaged in MBTA enforcement.

41. FWS dropped enforcement actions that it had commenced before the issuance of the Jorjani Opinion.

42. The Jorjani Opinion resulted in an increase in uncovered waste ponds with surface oil and other potentially lethal hazards to birds that FWS no longer exerted authority to address.

**F.     Multistate Lawsuit Challenging the Jorjani Opinion**

43. On September 6, 2018, the States of New York, California, Illinois, Maryland, New Jersey, New Mexico, and Oregon, and the Commonwealth of Massachusetts brought an action in the U.S. District Court for the Southern District of New York seeking a ruling that the Jorjani Opinion was arbitrary, capricious, and contrary to law and therefore violated the MBTA and the Administrative Procedure Act. *See* Complaint, *State of New York et al. v. U.S. Dep't of Interior et al.*, No. 18-cv-8084 (S.D.N.Y., filed Sept. 6, 2018), Dkt. No. 6.

44. That multistate lawsuit was consolidated with two related lawsuits filed by environmental groups. *See NRDC v. U.S. Dep't of Interior et al.*, 397 F. Supp. 3d 430, 434 (S.D.N.Y. 2019).

45. On August 11, 2020, the U.S. District Court for the Southern District of New York granted summary judgment in favor of the plaintiffs and vacated the Jorjani Opinion as contrary to law under the Administrative Procedure Act. The Court held that the MBTA's "clear language making it unlawful 'at any time, by any

23

means or in any manner, to . . . kill . . . any migratory bird' protected by the conventions is in direct conflict with the Jorjani Opinion." *NRDC*, 2020 WL 4605235, at *9. The Court further held that the Jorjani Opinion "runs counter to the purpose of the MBTA to protect migratory bird populations" and is "simply an unpersuasive interpretation of the MBTA's unambiguous prohibition on killing migratory birds." *Id.* at *8.

46.    On October 9, 2020, Interior filed a notice of appeal to the Second Circuit, where an appeal is now pending.

## G.    FWS Regulation Codifying the Jorjani Opinion

### 1.    <u>The February 2020 Proposed Rule</u>

47.    On February 3, 2020, while the multistate lawsuit challenging the Jorjani Opinion was still pending before the District Court, Interior published a notice of proposed rulemaking "to codify [the Jorjani Opinion] in a regulation defining the scope of the MBTA." 85 Fed. Reg. 5915, 5916 (Feb. 3, 2020) (the "Proposed Rule").

48.    Consistent with the Jorjani Opinion's analysis and conclusions, the Proposed Rule aimed to "defin[e] the scope of the MBTA's prohibitions to reach only actions directed at migratory birds, their nests, or their eggs." *Id.*

49.    On March 19, 2020, the States submitted comments opposing the Proposed Rule.[1]

---

[1] The Commonwealth of Pennsylvania did not join the March 19, 2020 comments on the Proposed Rule.

50.    The vast majority of other commenters also expressed opposition to the Proposed Rule.

**2.    The February 2020 Notice of Intent to Prepare an Environmental Impact Statement**

51.    On February 3, 2020, the same day that FWS published the Proposed Rule, FWS published a notice of intent to prepare an environmental impact statement (the "Notice of Intent").  85 Fed. Reg. 5913 (Feb. 3, 2020).

52.    On March 19, 2020, the States submitted comments on the Notice of Intent.[2]

53.    The States recommended that FWS consider "[1] the effectiveness of best practices or measures to mitigate take of migratory birds under the MBTA and adverse impacts to migratory bird resources; [2] the potential for environmental impacts to non-bird resources, such as cultural resources, from measures to protect birds; [3] the effects on migratory bird populations of sources of mortality other than incidental take; and [4] the effects on migratory bird populations of impacts to migratory bird habitat, including, but not limited to, climate change."

54.    The States also recommended that FWS consider: (1) "[t]he anticipated loss of migratory birds that will result from rejecting the Service's longstanding interpretation that the Act prohibits incidental take"; (2) "[t]he anticipated impacts on the behavior of industry actors"; (3) the anticipated impact on forestry, agriculture, biodiversity, ecosystems, seed dispersal, insect control, tourism,

---

[2] The Commonwealth of Pennsylvania did not join the March 19, 2020 comments on the Notice of Intent.

birdwatching, and hunting; and (4) "[t]he anticipated loss of funding from MBTA penalties for habitat restoration programs."

55.     The States further recommended that FWS consider various alternatives to the Proposed Rule, including: (1) "establish[ing] a general conditional authorization for incidental take by certain hazards to birds associated with particular industry sectors, provided that those industry sectors adhere to appropriate standards for protection and mitigation of incidental take of migratory birds"; (2) "issuing individual incidental take permits for projects or activities not covered under the described general, conditional authorization that present complexities or siting considerations that inherently require project-specific considerations, or for which there is limited information regarding adverse effects"; (3) "establish[ing] a procedure for authorizing incidental take by Federal agencies that commit in a memorandum of understanding . . . with [FWS] to consider impacts to migratory birds in their actions and to mitigate that take appropriately"; and (4) "working with particular industry sectors to develop voluntary guidance that identifies best management practices or technologies that can be applied to avoid or minimize avian mortality resulting from specific hazards in those sectors[.]"

### 3.    **The May 2020 Draft Environmental Impact Statement**

56.     In May 2020, FWS published a draft environmental impact statement (the "DEIS").

57.     The DEIS analyzed the likely environmental impacts of three scenarios: (1) a No Action Alternative, which would leave the Jorjani Opinion in place but not promulgate the Proposed Rule; (2) Alternative A, FWS's preferred alternative, which would implement the Proposed Rule; and (3) Alternative B, which would reinstate the longstanding interpretation of the Act, as the States urged in their March 19, 2020 comments.

58.     FWS acknowledged in the DEIS that industry best practices are highly effective in reducing bird mortality.  For example, FWS noted that "[f]or oil pits, bird mortality can be virtually eliminated if netting is installed and maintained." DEIS at 41.  Likewise, for communications towers, changing to flashing lights and removing guy wires has been shown to reduce mortality by 70%.  *Id.*

59.     The DEIS found that Alternative B—reinstating the longstanding interpretation of the Act—would likely increase the implementation of best practices while the other alternatives would likely decrease use of best practices and therefore increase bird mortality.  *See, e.g.*, *id.* at 8-9, 46.  Specifically, FWS found that, under Alternative B, "[m]ore entities would likely implement best practices to avoid the threat of enforcement.  Therefore, there is likely to be a decrease in bird mortality compared to the No Action Alternative."  *Id.* at 8.

60.     By contrast, FWS found in the DEIS that, under the No Action Alternative, "as entities become more confident of the long-term application of [the Jorjani Opinion], there will be a likely reduction in the number of best practices implemented."  *Id.*  Alternative A is even worse.  According to the DEIS, if the

27

Jorjani Opinion were codified, even "fewer entities would likely implement best practices compared to the No Action Alternative, resulting in increased bird mortality." *Id.*

61.    On July 20, 2020, the States submitted comments urging FWS to adopt Alternative B (*i.e.*, reinstate the longstanding interpretation of the Act) both because: (1) it is the only alternative based on a lawful interpretation of the Act and (2) it is, as the DEIS acknowledged, the only alternative that would increase the number of entities implementing best practices for avoiding bird deaths and therefore decrease mortality of migratory birds.[3]

62.    The States further commented that "FWS failed in the DEIS to fully evaluate the environmental impacts of [the Jorjani Opinion] by, among other things [1] quantifying how specifically the [Jorjani] Opinion has changed industry behavior since its issuance and [2] what effect that changed behavior has had on industry efforts to employ best management practices to limit incidental take and associated adverse impacts on migratory birds."

63.    The Government of Canada submitted separate comments opposing Alternative A (*i.e.*, codifying the Jorjani Opinion) as being inconsistent with previous understandings between Canada and the United States.

---

[3] The State of California and Commonwealth of Pennsylvania did not join the July 20, 2020 comments.

### 4.    **The November 2020 Final Environmental Impact Statement**

64.    In November 2020, FWS published a final environmental impact statement ("FEIS"), which made very few substantive changes to the DEIS.

65.    In the FEIS, FWS acknowledged that the Jorjani Opinion, which the Proposed Rule sought to codify, had been vacated.  However, FWS asserted in the FEIS that "[t]he court's vacatur of the M-Opinion does not directly affect our rulemaking process and effectively underscores the need to codify our official interpretation of the MBTA's application to incidental take."  FEIS at 13.

66.    The FEIS included some additional data regarding population trends of Canadian birds and general threats to seabirds, but it did not include data responsive to the issues raised in the States' comments on the DEIS.  In particular, the FEIS did not quantify impacts on migratory bird populations or impacts on the use of best practices by regulated parties.

67.    In the FEIS, FWS continued to find that adopting the Proposed Rule would likely "result[] in increased bird mortality" as "fewer entities would likely implement best practices."  FEIS at 8.

### 5.    **The January 2021 Final Rule**

68.    On January 7, 2021, FWS published the Final Rule, which expressly adopts the reasoning and conclusions of the now-vacated Jorjani Opinion.  The rule becomes effective February 8, 2021.

69.    The Final Rule is arbitrary, capricious, and contrary to law.

70.    First, the Final Rule is inconsistent with the Act's text, which prohibits taking or killing migratory birds "at any time, by any means or in any manner."  16 U.S.C. § 703(a).

71.    Second, the Final Rule is inconsistent with the Act's clear purpose of protecting migratory bird populations because, contrary to that purpose, the Final Rule's express purpose is to decrease protections for migratory bird populations.

72.    Third, the Final Rule is inconsistent with the Act's legislative history. When Congress amended the Act to impose mental state requirements for selling migratory birds or hunting migratory birds over baited fields, it reaffirmed that the general prohibition on killing migratory birds would continue to impose strict liability and not be limited to acts specifically directed at killing migratory birds.

73.    Fourth, the Final Rule is inconsistent with subsequent legislation confirming that the Act regulates incidental take, as well as the incidental take regulations that FWS promulgated in response, including a requirement that FWS regulate incidental take from military-readiness activities.

74.    Fifth, the Final Rule is inconsistent with *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir. 1978) (affirming conviction for incidental take).

75.    Sixth, the Final Rule is inconsistent with the treaties that the MBTA implements, which mandate that the United States and other signatories regulate incidental take, and is therefore contrary to principles of international comity.

**H.    Harm to the States**

76.    The Final Rule will harm the States by depriving them of the MBTA's protections for migratory birds that nest in, winter in, or pass through their territories.

77.    The States own, or hold in trust, all game and wildlife within their borders, including migratory birds.

78.    The States' interests in migratory birds are harmed by incidental take in the States themselves and outside of the States.  Migratory birds that nest or winter in, or migrate through, a particular state can be killed anywhere their migrations take them.

79.    Migratory birds also provide scientific and recreational opportunities and aesthetic benefits enjoyed by many people in the States.  According to the most recent state-level data in the federal government's "2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation," in 2011, approximately 4.1 million New York residents participated in birdwatching and other wildlife watching, along with 6.5 million California residents, 3.3 million Pennsylvania residents, 2.8 million Illinois residents, 1.9 million Washington residents, 1.7 million New Jersey residents, 1.5 million Massachusetts residents, 1.5 million Minnesota residents, 1.2 million Maryland residents, 1.2 million Oregon residents, 1.1 million Connecticut residents, and 486,000 New Mexico residents.  *Id.* at 94. Nationwide, birdwatching was by far the most popular form of wildlife watching: of the 72 million U.S. residents who engaged in wildlife watching, 47 million were birdwatchers.  2011 National Survey at 36.

31

80.     That same year, in 2011, birdwatchers and other wildlife watchers spent approximately $4.2 billion per year in New York, $3.7 billion in California, $3.2 billion in Washington, $2.3 billion in Massachusetts, $1.7 billion in Oregon, $1.3 billion in Illinois, $1.3 billion in Pennsylvania, $986 million in New Jersey, $935 million in Connecticut, $621 million in Minnesota, $480 million in Maryland, and $327 million in New Mexico.  *Id.* at 97.

81.     Prior to the Jorjani Opinion, the States also benefitted from MBTA penalties for incidental take that funded wetlands and bird habitat restoration projects.  *See* 16 U.S.C. § 4406(b).  For example, in 2003, a tanker spilled an estimated 98,000 gallons of oil in Buzzards Bay, Massachusetts, which killed a recorded 461 birds.  The judge sentenced the company to pay a $10 million fine for violations of the MBTA, of which $7 million was dedicated to wetlands conservation projects in Massachusetts.  The States will now be deprived of such restoration projects.

## CLAIM FOR RELIEF

**The Final Rule is Arbitrary, Capricious, and Not in Accordance with Law,
in Violation of the Administrative Procedure Act,
5 U.S.C. § 706(2)(A)**

82.     The States hereby incorporate by reference the allegations contained in Paragraphs 1 through 81 as if fully set forth herein.

83.     Under the Administrative Procedure Act, courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

84.    The MBTA makes it unlawful to "take" or "kill" any migratory bird "by any means or in any manner."  16 U.S.C. § 703(a).  This broad prohibition applies to activities and conduct that immediately or foreseeably take or kill migratory birds, whether or not those activities and conduct are specifically intended to take or kill migratory birds.

85.    The Final Rule is premised on the reasoning and conclusions of the Jorjani Opinion, which this Court vacated as contrary to law.

86.    Like the Jorjani Opinion, the Final Rule is contrary to law because it is: (1) in "direct conflict" with the Act's "clear language making it unlawful 'at any time, by any means or in any manner, to . . . kill . . . any migratory bird'"; (2) "counter to the purpose of the MBTA to protect migratory bird populations"; (3) inconsistent with the Act's legislative history; (4) irreconcilable with subsequent legislation reaffirming that the Act regulates incidental take and directing Interior to regulate incidental take; (5) incongruous with *United States v. FMC Corp.*, 572 F.2d 902 (2d Cir. 1978); and (6) violates principles of international comity.

87.    For each and all of these reasons, the Final Rule is arbitrary, capricious, and otherwise not in accordance with law.

## REQUEST FOR RELIEF

The States respectfully request that this Court enter judgment:

1.    Declaring that the Final Rule is arbitrary, capricious, and otherwise not in accordance with law;

2.    Declaring the Final Rule unlawful, setting it aside, and vacating it;

3.     Awarding the States their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation pursuant to 28 U.S.C. § 2412; and

4.     Awarding the States such additional and further relief as the Court deems just and proper.

DATED: January 19, 2021                    Respectfully submitted,

                                           FOR THE STATE OF NEW YORK

                                           LETITIA JAMES
                                           Attorney General

                                           By:  */s/ Matthew Eisenson*
                                                Matthew Eisenson (ME 1987)
                                                *Assistant Attorney General*
                                                Andrew J. Gershon
                                                *Senior Counsel*
                                                Monica Wagner
                                                *Deputy Bureau Chief*
                                                Environmental Protection Bureau
                                                Office of the Attorney General
                                                28 Liberty St
                                                New York, NY 10005
                                                (212) 416-8459
                                                Matthew.Eisenson@ag.ny.gov
                                                Andrew.Gershon@ag.ny.gov
                                                Monica.Wagner@ag.ny.gov

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
Attorney General
David A. Zonana
Supervising Deputy Attorney General

By: */s/ Andrew Wiener*
    Andrew Wiener*
    Elizabeth Rumsey*
    *Deputy Attorneys General*
    1515 Clay Street
    Oakland, CA 94612-0550
    (510) 879-1975
    Andrew.Wiener@doj.ca.gov
    Elizabeth.Rumsey@doj.ca.gov

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General

By: */s/ Daniel M. Salton*
    Daniel M. Salton*
    Matthew I. Levine*
    *Assistant Attorneys General*
    Office of the Attorney General
    165 Capitol Avenue
    Hartford, CT 06106
    (860) 808-5250
    daniel.salton@ct.gov
    matthew.levine@ct.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

By: */s/ Gerald Karr*
    Gerald Karr*
    *Supervising Attorney*
    Jason James*
    *Assistant Attorney General*
    Matthew J. Dunn*
    *Chief, Environmental*
    *Enforcement/Asbestos Litig. Div.*
    69 West Washington 18th Floor
    Chicago, IL 60602
    (312) 814-3369
    gkarr@atg.state.il.us
    jjames@atg.state.il.us

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

By: */s/ John B. Howard, Jr.*
    John B. Howard, Jr.*
    *Special Assistant Attorney General*
    Office of the Attorney General
    200 Saint Paul Place, 20th Floor
    Baltimore, Maryland 21202
    (410) 576-6300
    jbhoward@oag.state.md.us

FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
Attorney General

By:  */s/ Seth Schofield*            
      Seth Schofield*
      *Senior Appellate Counsel*
      Megan M. Herzog*
      *Special Assistant Attorney General*
      Energy and Environment Bureau
      One Ashburton Place, 18th Floor
      Boston, MA 02108
      (617) 963-2436
      seth.schofield@mass.gov
      megan.herzog@mass.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

By:  */s/ Peter Surdo*                 
      Peter Surdo*
      *Special Assistant Attorney General*
      445 Minnesota Street, Suite 900
      St. Paul, Minnesota 55101-2127
      (651) 757-1061
      peter.surdo@ag.state.mn.us

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
Attorney General

By:  */s/ Gwen Farley*              
      Gwen Farley
      *Deputy Attorney General*
      New Jersey Division of Law
      R.J. Hughes Justice Complex
      25 Market Street
      Trenton, NJ 08625
      (609) 376-2761
      gwen.farley@law.njoag.gov

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
Attorney General

By: */s/ William Grantham*           
      Cholla Khoury,* Division Director
      William Grantham*
      *Assistant Attorneys General*
      State of New Mexico
      Office of the Attorney General
      Consumer & Environmental
      Protection Division
      201 Third St NW, Suite 300
      Albuquerque, NM 87102
      (505) 717-3520
      WGrantham@nmag.gov
      CKhoury@nmag.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

By:  */s/ Steve Novick*
    Steve Novick*
    Special Assistant Attorney General
    Natural Resources Section
    Oregon Department of Justice
    1162 Court Street NE
    Salem, OR 97301-4096
    (503) 971-1891
    steve.novick@doj.state.or.us

FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General

By: /s/ Aimee D. Thomson
    Aimee D. Thomson
    *Deputy Attorney General*
    Ann Johnston*
    *Senior Deputy Attorney General*
    Impact Litigation Section
    Pennsylvania Office of Attorney General
    1600 Arch Street, Suite 300
    Philadelphia, PA 19103
    (267) 374-2787
    athomson@attorneygeneral.gov
    ajohnston@attorneygeneral.gov

FOR THE STATE OF WASHINGTON

Robert W. Ferguson
Attorney General

By:  */s/ Aurora R. Janke*
    Aurora R. Janke*
    Assistant Attorney General
    Counsel for Environmental Protection
    800 5th Ave Suite 2000, TB-14
    Seattle, WA 98104-3188
    (206) 233-3391
    aurora.janke@atg.wa.gov

* Not yet admitted to the Bar of this Court.